Filed 6/15/21  Jonathan E. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| JONATHAN E.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Real Party in Interest. | F082242<br><br>(Super. Ct. No. 18CEJ300315-3)<br><br><br>**OPINION** |

### THE COURT\*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Gary L. Green, Commissioner.

Jonathan E., in pro. per., for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*        Before Poochigian, Acting P.J., Peña, J. and Smith, J.

Petitioner Jonathan E. (father), in propria persona, seeks an extraordinary writ from the juvenile court's orders denying him reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(6)[1] and setting a section 366.26 hearing as to his now 19-month-old son, Julius. (Cal. Rules of Court, rule 8.452.) Section 361.5, subdivision (b)(6) requires the court to find by clear and convincing evidence that, as relevant here, the child was adjudicated a dependent as a result of severe physical harm to the child or the child's sibling and it would not benefit the child to pursue reunification services with the offending parent. The sibling who suffered severe physical harm in this case was father's teenage stepson, Dylan. In October 2018, father physically assaulted and verbally abused Dylan over an estimated three to four hours. Dylan and Julius's mother and father's wife, Jessica E. (mother), was present during part of the assault but did not intervene. She was denied reunification services for Dylan (§ 361.5, subd. (b)(6)) but was provided services to reunify with Dylan's twin sister, Chloe. At the six-month review hearing, the juvenile court terminated mother's services and set a section 366.26 hearing. Mother filed a writ petition which we denied.[2] She was also denied reunification services in Julius's case and filed a writ petition which is pending in our case No. F082256.

Father seeks relief by way of a writ ordering the juvenile court to vacate the section 366.26 hearing and order reunification services. He contends his constitutional rights were violated because Julius was wrongfully removed from his custody (Fourth Amendment), he was "prosecuted" twice for the same crime (a reference to the juvenile court's intervention in Dylan and Julius's cases because of his physical abuse of Dylan) (Fifth Amendment) and he was not allowed to defend himself in Dylan's case because he

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] On our own motion, we take judicial notice of our case file and opinion in case No. F080080. (Evid. Code, §§ 452, subd. (d), 459, subds. (a)-(c).)

2

is not the biological father (due process).  He further argues Dr. London, the psychologist who conducted his risk assessment, was biased yet the juvenile court relied heavily on her assessment.  Finally, he contends the restrictions imposed because of the COVID-19 pandemic delayed the proceedings, interfered with his ability to attend classes and prevented him from fully bonding with Julius.  He informs this court that he completed a parenting program and a parent partner support group, only missed one session of his child abuse batterers program and received instruction in emergency dosing and injections to treat Julius's medical condition.[3]  At oral argument, he presented these arguments, adding that he and Dylan had repaired their relationship and Dylan did not hold a grudge against him.

We stayed the section 366.26 hearing scheduled for May 5, 2021 and directed real party in interest to file a letter brief, addressing the evidence that supports the juvenile court's finding it would not benefit Julius to pursue reunification services with father, specifically addressing the factors listed in section 361.5, subdivision (i).[4]  The parents were granted leave to explain why the evidence was insufficient to support the finding based on the same factors.  Real party chose not to respond with particularity regarding

---

[3]     Julius has a genetic condition which impairs his ability to retain salt.

[4]     In determining whether reunification services will benefit the child under section 361.5, subdivision (b)(6), subdivision (i) of that same section requires the juvenile court to consider any relevant information, including the following:  (1) the specific act or omission comprising the severe physical harm inflicted on the child or the child's sibling or half sibling; (2) the circumstances under which the abuse or harm was inflicted on the child or the child's sibling or half sibling; (3) the severity of the emotional trauma suffered by the child or the child's siblings or half sibling; (4) any history of abuse of other children by the offending parent; (5) the likelihood that the child may be safely returned to the care of the offending parent within 12 months with no continuing supervision; and (6) whether or not the child desires to be reunified with the offending parent.

the factors but instead relied on its opposition. Father's responsive brief reiterated the arguments he raised at oral argument.

The question on appeal is whether substantial evidence supports the juvenile court's findings and orders. We conclude that it does, deny the petition and lift the stay.

## PROCEDURAL AND FACTUAL SUMMARY

In October 2019, Julius was born prematurely at 36 weeks gestation and admitted to the neonatal intensive care unit. Mother reported using marijuana throughout her pregnancy for pain management and nausea, and to increase her appetite. The year before, her twins, then 17-year-old Chloe and Dylan, were removed from her custody after father hit Dylan for three to four hours on the legs, buttocks, ribs and genitals with a leather belt, a metal hose from a vacuum cleaner and a metal bat. Father beat Dylan so hard the vacuum attachments broke. Father also picked him up by the legs, pushed him against the wall, punched him in the ribs and picked him up by the hair. Mother witnessed the beating but did not intervene. She reportedly said that Dylan was a " 'jerk' " and deserved the beating. Dylan disclosed being physically abused by father several times before that incident. Mother was provided parenting, mental health and domestic violence services to reunify with Chloe. The court denied mother reunification services for Dylan (§ 361.5, subd. (b)(6)) and ordered him into long-term foster care. In September 2019, the juvenile court terminated mother's services for Chloe based on the results of a psychological evaluation and risk assessment performed by Dr. London that indicated she would not be willing or able to intervene on Chloe's behalf to protect her from father. The court set a section 366.26 hearing in January 2020 as to Chloe.

Mother claimed her doctor knew she was using marijuana during her pregnancy with Julius and child protective services misunderstood the circumstances involving her twins. Dylan had many behavioral problems and was using drugs when he had the

4

altercation with father. It was a " 'teenager thing' " which no one was willing to consider.

The Fresno County Department of Social Services (department) took Julius into protective custody and placed him in foster care. The department filed a dependency petition, alleging Julius was at a substantial risk of suffering serious physical harm or neglect because of his parents' marijuana use and mother's failure to protect Julius's half sibling, Dylan, from father's physical abuse. (§ 300, subds. (b) & (j).)

The juvenile court ordered Julius detained and offered the parents parenting classes, substance abuse, mental health and domestic violence evaluations and random drug testing. The court ordered weekly supervised visitation and set the jurisdictional/dispositional hearing (combined hearing) for January 23, 2020.

Prior to the combined hearing, the department filed a third amended petition, adding a section 300, subdivision (a) (serious physical harm) count as to father, alleging his abuse of Dylan placed Julius at a substantial risk of suffering serious physical harm. As factual support, the petition alleged, "On or about October 30, 2018, Julius's half-sibling, Dylan, disclosed [father] has physical[ly] abused him. The physical abuse consisted of, but is not limited to, hair pulled out, wounds and bruises on his right thigh and buttocks. The child, Dylan, disclosed [father] hit him for a duration of 3-4 hours on his legs, buttocks, ribs and genitals, using a leather belt, a metal hose from a vacuum cleaner and a metal bat. In addition, Dylan disclosed [father] picked him up from his legs, pushed him against the wall, punched him in the ribs with a closed fist and picked [him up] by pulling his hair. Dylan further disclosed being physically abused on several occasions by [father]. Julius would be at risk of physical harm if left in the care of his [father]." The amended petition also included an additional section 300, subdivision (b) count as to each parent, alleging father's physical abuse of Dylan and mother's failure to intervene placed Julius at a substantial risk of suffering serious physical harm.

5

In its report for the dispositional hearing, the department informed the juvenile court the parents were participating in some of the services offered to them. They enrolled in a parenting class, which they were scheduled to begin on March 24, 2020. They completed substance abuse and domestic violence assessments and were referred for outpatient treatment, the child abuse intervention program and a mental health assessment. They also enrolled in random drug testing and each tested positive four times for marijuana. Mother also tested positive for creatinine and opiates.

The department recommended the juvenile court deny mother reunification services under section 361.5, subdivision (b)(7) because she was denied reunification services as to Dylan under section 361.5, subdivision (b)(6) and under section 361.5, subdivision (b)(10) because her services as to Chloe were terminated and she failed to make subsequent efforts to resolve the problem that required Chloe's removal. The department recommended the court deny father services under section 361.5, subdivision (b)(6) because of the severity of the physical abuse he inflicted on Dylan. In determining whether services would benefit Julius notwithstanding the applicability of section 361.5, subdivision (b)(6) and (7), the department considered the severity of Dylan's injuries, Dylan and Chloe's disclosure that father previously abused them, mother's belief that Dylan deserved the abuse, and the parents' unwillingness to take responsibility for the abuse. The department opined it would not be in Julius's best interest to provide the parents reunification services.

On January 23, 2020, the juvenile court set a contested combined hearing for March 18, 2020. The hearing was continued until July 16, 2020.

In June 2020, social worker Brittany Smith contacted the parents' service providers about their progress. They were participating in a parenting class and expected to graduate in August 2020. They were testing negative for all substances. Their substance abuse counselor, however, said father became easily agitated, was difficult to

6

work with and was "borderline hostile." Father was participating in the child abuse intervention program and completed seven classes before classes were cancelled in March 2020 because of the COVID-19 pandemic. Mother was dropped from the program for nonattendance and required to start again when classes resumed. The parents were referred for mental health assessments in January 2020 but declined the appointment, stating they were too busy. Father said he was not aware of the referral. Smith referred them again in June 2020. Mother informed Smith she and father were seeing a private therapist. The parents provided a letter from their therapist showing they participated in individual therapy sessions from February 24 to April 29, 2020.

On July 16, 2020, the juvenile court conducted the jurisdictional hearing. Counsel argued the case and the parents' attorneys submitted documents evidencing their participation in services. The court continued the matter for the following day to allow it time to read all of the department's reports and review the exhibits.

On July 17, 2020, the juvenile court sustained the third amended petition, finding Julius was a minor described by section 300, subdivisions (a), (b) and (j). The court dismissed the subdivision (b) counts alleging the parents' marijuana use placed Julius at risk of harm (counts b-1 and b-2). The court continued the matter to July 22 for disposition. After hearing the parents' testimony on July 22, the court ordered the parents to undergo a risk assessment and continued the dispositional hearing. The hearing was ultimately conducted as a contested hearing on January 8, 2021.

Meanwhile, Dr. London met with the parents over several days in September 2020 to assess their cognitive integrity, psychological functioning, and level of risk to Julius. She reported her findings in November 2020. Mother told Dr. London Dylan was in a transitional home. He discontinued all visits with her two to three months before, but she did not know why. She had unlimited video conferences with Chloe, who she believed to be doing "fairly well." She explained the twins were removed because father physically

7

abused Dylan and she did not stop it. Dylan was having behavioral issues and problems at school. She later found out he was getting pills from other students at school. She regretted not watching over him and checking on him more.

Father told Dr. London that Dylan was defiant. When he was with his biological father, " 'he got to run the house.' " Father was raised in a military family and imposed structure in the family. Dylan did not like the structure. He bullied his sister and was defiant to mother. He ditched school, lied to his teachers and went on websites that were forbidden to him. Father initially attempted rewards and gifts and positive reinforcement but found spanking Dylan's " 'butt' " with his hand got better results. As to the incident with Dylan, father said, " 'he got his butt whooped. It was a three to four hour long discussion, arguing, and him making excuses. He would get his butt whooped during points in the conversation.' " Father claimed he spanked Dylan with his hand and with a belt. He was holding a bat but did not hit Dylan with it.

Dr. London opined mother posed a substantial risk of harm to Julius, explaining:

> "While [mother] did not herself physically abuse [Dylan], she was neglectful in that she not only allowed it to happen, but watched the abuse occur over a period of hours and did not intervene in order to stop it. Although [mother] indicated what occurred with Dylan would never happen again, at no time during this evaluative process did she express any emotional distress or articulate remorse for that which her son suffered as a result of her neglect. At no time did she exhibit enhanced insight and/or self-awareness regarding the fact that she allowed her husband to physically abuse her son for hours and she did nothing to stop it. At no time did [mother] identify the possible emotional and psychological ramifications of her husband's abuse or of her inaction on Dylan. She did not express any desire to reconnect with Dylan emotionally or even spend time with him at any point in the future. To the contrary, [mother] noted Dylan has decided that he does not want any contact with her for unknown reasons."

Dr. London continued:

> "[Mother] remains married to the man who severely abused her son. At no time during the clinical interview did she express any anger toward

her husband for the abuse her son suffered or for the fact that this abuse resulted in her two eldest children being removed from her care and custody. Consistent with that which was reported by [Smith], there is nothing to suggest that [mother] would be willing and/or have the ability to protect her child from abuse in the future. Results of this assessment suggest [mother] is one who seeks approval from others and will modify her behaviors in order to avoid disapproval. Moreover, she exhibits dependent personality features."

Dr. London also concluded father posed a substantial risk of harm to Julius. The risk assessment indicated that he demonstrated poor judgment and self-awareness. He blamed Dylan for the abuse he suffered and continued to justify the abuse he perpetrated against Dylan. Although he acknowledged learning other forms of discipline from his parenting classes, he did not express remorse for his actions at any time during the evaluation. Dr. London found no evidence to suggest that father had the ability to provide an emotionally, physically, psychologically safe and nurturing home environment for Julius. Given father's limited frustration tolerance, poor judgment and poor insight, she believed it reasonable he could react in an abusive manner with Julius if Julius did not do exactly what father wanted, when he wanted and how he wanted.

On January 8, 2021, the juvenile court convened the contested dispositional hearing and received into evidence a letter from father's therapist and certificates evidencing the parents completed a parenting class. The court also accepted stipulated testimony from Dylan that he was voluntarily visiting the parents. He did not bear a grudge against father and did not have any concerns about Julius being placed in their care. County counsel submitted its case on its report.

Dr. London testified she determined father lacked judgment during the clinical interview when he attempted at length to justify the abuse perpetrated against Dylan. He told her all the reasons why it happened in an attempt to justify it but did not acknowledge that it was wrong to abuse another human being. She maintained her opinion Julius would be at risk in father's custody.

9

Mother's attorney questioned Dr. London about the propriety of conducting a second risk assessment on mother and her ability to be objective in this case. Dr. London did not realize until their first meeting that she had previously evaluated mother. Asked whether it would have been a "best practice" to have another psychologist evaluate mother, Dr. London answered, "You know, I don't know," adding another clinician would not have the advantage of background information. Additionally, mother did not object to being evaluated by Dr. London. Dr. London disagreed she was "just reconfirming" the prior evaluation and considered Julius's circumstances a new case, a "whole new evaluation process." It would not change her opinion to know that Dylan visited mother and that Dylan forgave her. Asked what she found most troubling about mother, Dr. London stated her poor insight into the extent of trauma Dylan experienced and her lack of remorse and accountability.

The juvenile court asked Dr. London whether father was capable of safely having Julius in his care. Dr. London thought it was "possible," but she was not confident that he could be safe with him. In order to believe father was safe, she needed him to "take responsibility for his actions, not provide a litany of reasons as to essentially why Dylan deserves to be abused or why the abuse was justified." She needed him to express remorse and understanding that Dylan experienced trauma and acknowledge his need to address his low frustration tolerance, poor anger management and inappropriate interactions with children.

Dr. London had similar concerns about mother's lack of remorse and insight. Mother expressed no dissatisfaction with father regarding the degree of abuse he inflicted. Dr. London also questioned mother's ability to protect Julius if father became upset, dissatisfied or enraged. To consider mother safe, Dr. London needed to see that she was remorseful, truly understood the psychological damage Dylan suffered because of the abuse and had the ability to protect Julius should father become angry.

Father testified that he was remorseful that the incident with Dylan occurred and that his actions resulted in mother not having custody of her twins and that they could not bring Julius home from the hospital. He was remorseful for not being there for Dylan and understanding that he was grieving the loss of his father. He understood that his actions were wrong and that he traumatized Dylan. Father wished he had handled the situation differently. He apologized to Dylan and told him he wished he had known better.

Mother testified she last used marijuana around March 5, 2020. She completed 12 of the 26 required sessions for the domestic violence program and 31 of the 52 required sessions to complete the child abuse intervention program. She better understood through the child abuse intervention program how trauma in her childhood affected her and that she needed to stop the cycle of abuse from impacting her children. She was sorry she did not intervene to help Dylan. She should have paid more attention to him and insisted he get therapy to deal with his father's death. She did not believe Dylan was responsible for the abuse he suffered. She visited with Julius twice a week. Most of the visits were virtual but she attempted to engage him by talking to him about what he was doing. She believed Julius was bonded to her. If necessary, she would separate from father to gain custody of Julius. However, she had no plan to separate from him unless she was court ordered. She believed she could support herself and Julius.

Mother was present during the incident between father and Dylan for an hour or more and most of what she witnessed was verbal interaction. She did not witness physical abuse or physical injuries. However, father showed her the baseball bat and how he struck Dylan with it. When pressed, she admitted seeing father strike Dylan with the bat in the stomach. She believed father physically and verbally abused Dylan but did not believe father had a problem with anger. The only domestic violence in her home was between herself and Dylan and father and Dylan.

11

Smith testified she had been the social worker assigned the case since March 2020. Neither parent expressed remorse to her about Dylan's experience nor acknowledged the severity of the harm inflicted. However, she never directly asked mother if she was remorseful. Smith did not believe Julius could be safely placed in parental custody without court supervision. She believed based on the parents' testimony they were still minimizing their actions. She had not seen either parent have a significant change in their respective understanding of the case, although father appeared less aggressive and more cooperative.

County counsel argued the evidence supported denying the parents reunification services; the only issue was whether providing them services would serve Julius's best interest. County counsel argued it would not, citing the severity of the harm inflicted on Dylan, the parents' minimizing their role in the abuse, the length of time Julius had been out of their care and their failure to benefit from the services offered since the detention hearing. Minor's counsel concurred.

The parents' attorneys argued for reunification services based on Julius's best interest. Father's attorney argued father believed his conduct with Dylan was disciplinary, which he realized was wrong. Dylan's stipulated testimony demonstrated father had taken steps to reconcile the situation and Dylan was healing emotionally from the incident. She pointed out father did not have a history of abuse and was stable and sober but was not given credit for these positive aspects of his life. She did not believe he should be penalized by losing custody of his only child for an incident that happened two years before and for which he did his best to atone.

Mother's attorney pointed out mother was not the perpetrator of the abuse but took full responsibility for not intervening and had developed a relationship with Dylan. Mother had completed a significant portion of her services and could complete them if given more time. Although mother was hindered by the limitations of virtual visitation,

12

she developed a strong bond with Julius.  Additionally, although counsel was not critical of Dr. London's method of assessing mother, he argued best practice would have been to refer mother to a different therapist for the psychological evaluation.

The juvenile court found Dr. London and Smith fully credible but the parents evasive.  The court found Dylan suffered severe physical abuse based on Dylan's account that father physically abused him for three to four hours using a leather belt and metal tube, threatened him with a baseball bat, picked him up by the leg, pushed him against the wall and picked him up by the hair.  The court found there was clear and convincing evidence that Dylan suffered severe physical harm, stating, the "record made it so clear that this young man endured what could only be legally characterized as severe physical abuse."  As to mother, the court found section 361.5, subdivision (b)(10) did not apply because she made reasonable efforts to treat the problem.  However, it could not escape the applicability of section 361.5, subdivision (b)(7) since she was previously bypassed for services under subdivision (b)(6).

The juvenile court stated it was relying heavily on Dr. London's expertise and specifically addressed the fact that Dr. London performed both of mother's evaluations. The court found there was no showing another psychologist would have reached a different conclusion and mother's own testimony supported Dr. London's opinion.  The court noted mother testified, when asked what she learned from her domestic violence classes, "I have done actions that were not helpful."  That demonstrated to the court she minimized the events and grounds leading to the removal of Julius.  As to her testimony regarding the specifics of the incident with Dylan, her testimony was a "moving target." She was inconsistent as to the duration of her presence at the event and what she observed.  The court stated, "[Mother] now makes the excuse that she was not sufficiently engaged with Dylan to have prevented or mitigated the abuse that occurred to Dylan.  Although mother notes that she is to blame in connection with the incident, she

13

continues to attribute blame to Dylan at least in part. Of key concern to this court is mother's dependence on the father. Although the mother claims she is willing to leave the father, she appears financially dependent on him and has no viable support aside from him. In addition, she has volunteered today that the father should be in Julius's life."

As to father, the juvenile court stated, "When asked why the [d]epartment is involved in this case, [father] could not explain the depths of the [d]epartment's concerns for Julius's safety. [Father] was poised to explain that he needs a chance to prove himself. [Father] engaged in the same pattern he did with Dr. London to make excuses and to explain things away. As to the remorse for his actions, [father] noted his regret. [Father] appears to regret the results of his actions. When pressed to address the accountability, [father] seemed to focus on the use of a belt, vacuum hose, hands and bat and to indicate the use of those was wrong. [Father] used the excuse of the discipline in his own family, which is apparently physical confrontation. But in the case of Dylan, there was no intent to harm. That shows the disconnect."

The juvenile court continued, "[Father's] testimony reveals that he continues to blame Dylan, although [father] testified that he did not blame Dylan. In the next round, he testified that Dylan, 'Should have talked to us more.' … [¶] [Father] noted that Dylan should have communicated better. He also noted he still places an onus on Dylan. [Father] has had multiples opportunities to show true, genuine remorse and accountability…. When asked today to describe his remorse, [father] could only indicate that he was remorseful that the event with Dylan occurred and that … 'It led to all of this,' … including the removal of Julius."

The juvenile court removed Julius from his parents' custody and ordered a minimum of two supervised visits a month. The court denied mother reunification

services under section 361.5, subdivision (b)(7)[5] and father under subdivision (b)(6) and set a section 366.26 hearing for May 5, 2021.

## DISCUSSION

*Constitutional Violations*

Father contends various of his constitutional rights were violated because the department and the juvenile court acted based strictly on the circumstances of Dylan's case without cause to remove Julius and then penalized father for his prior conduct without giving him an opportunity to "defend" himself and remediate his behavior. As a preliminary matter, it must be stressed that juvenile dependency proceedings are civil in nature, *not* criminal. They are designed to protect the child, not prosecute the parent. Consequently, the juvenile court has the authority to issue a protective warrant to remove a child from parental custody if there is evidence the child may be at risk. In doing so, the court may consider the family history. Because dependency proceedings are not criminal, Fourth and Fifth Amendment claims (i.e. unlawful seizure and double jeopardy) do not pertain. A parent is not a "defendant" on trial.

Due process, however, is very germane in juvenile dependency proceedings because the "parent's interest in the companionship, care, custody and management of his or her children is a fundamental civil right. [Citation. ] Children, too, have a compelling independent interest in belonging to their natural family. [Citation. ] In addition, each

---

[5] In ruling the juvenile court stated it was denying mother reunification services under section 361.5, subdivision (b)(7) and (10), although it previously stated it was not denying her services under (b)(10) because the evidence did not support it. The minute order for the hearing also indicates she was denied services under subdivision (b)(7) and (10). Given the court's express statement the evidence did not support a denial under subdivision (b)(10), we conclude the court's subsequent statement was an oversight (i.e., a rote reading of a prepared order) and that the minute order is a clerical error. Although it does not affect our analysis in mother's case, we urge the juvenile court to correct its record to reflect the proper ruling.

15

child has a compelling interest to live free from abuse and neglect in a stable, permanent placement with an emotionally committed caregiver.  [Citation. ]  The governmental interest in a child's welfare is significant. '[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' " (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 223.)

Due process in the dependency context generally focuses on notice and the opportunity to be heard.  (*In re B.G*. (1974) 11 Cal.3d 679, 688–689.)  Specifically, a parent whose child may be found subject to the juvenile court's jurisdiction has a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, in order that he or she may make an informed decision whether to appear and contest the allegations.  (*In re Wilford J*. (2005) 131 Cal.App.4th 742, 751.)  Further, unless limited exceptions apply, a parent is entitled to services designed to reunify the family.  (§ 361.5, subd. (a).)

Only a parent is afforded due process rights in dependency proceedings and a stepparent is not a " 'parent.' " (*In re Jodi B*. (1991) 227 Cal.App.3d 1322, 1324.) Consequently, father did not have a right to challenge the allegations in Dylan's case, which although they described his conduct, were allegations against mother—that she failed to protect Dylan from physical and verbal abuse.  Nor was father entitled to services to reunify with Dylan. (*Id*. at p. 1329.)  Since father did not have any parental interest at stake in Dylan's case, due process did not require his participation in those proceedings.  He does not claim any due process violations in Julius's case, and we have not identified any in our review of the case.  The record reflects that father was represented by counsel at all times and actively participated in the proceedings.

*Jurisdiction*

Although father concedes the incident with Dylan lasted three to four hours, he contends that it was mostly verbal lecturing with occasional physical contact.  He

16

contends there is no medical evidence to support allegations Dylan was physically harmed. To the extent he now challenges the sufficiency of the evidence to support the juvenile court's jurisdictional findings that his physical abuse of Dylan placed Julius at a substantial risk of physical harm, the record does not support his claim.[6]

The juvenile court's authority to exercise its dependency jurisdiction over a minor child derives from section 300 and its subdivisions describing various ways in which a child has been harmed or is at risk of suffering harm. The court need only find by a preponderance of the evidence that the child is described by one of the subdivisions in order to assume jurisdiction over the child. Here, the juvenile court found Julius was a child described under subdivisions (a), (b) and (j). Since father's argument directly implicates subdivision (a) of section 300 since it targets serious physical harm, we will construe his statements as a challenge to the applicability of that subdivision and address it directly.

Section 300, subdivision (a) applies when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) The statute specifies, "For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (*Ibid*.)

The department offered evidence, which was undisputed, that father subjugated Dylan over a three-to-four-hour period during which father physically abused him by

---

[6] Although father did not rebut the evidence offered by the department to support the allegations he physically abused Dylan, he may challenge the sufficiency of the evidence to support them in his writ petition because the department bore the burden of proof and jurisdictional findings can be raised on appeal from the dispositional orders.

striking him on his legs, buttocks, ribs and genitals, using a leather belt, a metal hose and a metal bat.  He also picked Dylan up from his legs, pushed him against the wall, punched him in the ribs and picked him up by the hair.  Dylan sustained bruises on his thigh and buttocks.  It was further alleged father previously abused Dylan on several occasions.

Given the extent of the physical abuse both in terms of its duration and the mechanism as well as the injuries sustained, the juvenile court could find that father placed Julius at risk of similar physical abuse and exercise its dependency jurisdiction over him under section 300, subdivision (a).

*Removal*

"After finding that a child is a person described in Section 300, the court shall hear evidence on the question of the proper disposition to be made of the child."  (§ 358, subd. (a).)  In order to remove a child from parental custody, the juvenile court must find by clear and convincing evidence there is or would be a substantial danger to the child's physical or emotional well-being if the child were returned home and there are no reasonable means by which the child's physical health can be protected short of removal.  (§ 361, subd. (c).)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion."  (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103–1104.)  "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re D.B*. (2018) 26 Cal.App.5th 320, 332.)  "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.]  'The parent need not be

18

dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.)

On a challenge to the juvenile court's dispositional order, we review the finding to determine whether substantial evidence supports it. We do so bearing in mind that the juvenile court's decision to order a child removed from parental custody must be supported by the heightened standard of clear and convincing evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

Here, the juvenile court found Julius could not be placed in father's custody without subjecting Julius to a substantial risk of harm based on Dr. London's opinion and testimony which the court found credible. Dr. London opined that father exhibited low frustration tolerance and poor judgment and insight. Even though he learned other forms of discipline in his parenting classes, he persisted in blaming Dylan for the physical abuse. She believed he could react in an abusive manner toward Julius under the right circumstances. Father argues Dr. London was biased because she previously assessed mother, inferring that her knowledge of the family's history prevented her from rendering a valid clinical judgment. There is, however, no evidence that Dr. London was biased. She performed comprehensive psychological evaluations of mother and father, including interviews, record review and psychological testing and provided the court a full report of her findings and opinions. Mother's attorney specifically asked Dr. London if her opinion was swayed by her knowledge of mother's history. Dr. London said it was not; she considered Julius's a "new" case. No one challenged the reliability of Dr. London's methodology or her conclusions based on the testing and information provided.

Further, the juvenile court did not detect any bias in Dr. London's assessments or opinions. Rather, the court found Dr. London very credible and her opinion useful in determining whether father could safely parent Julius. The court found that he could not,

19

and father fails to show it is reasonably probable another psychologist would have concluded differently.  On the evidence before it, the juvenile court could properly find there was or would be a substantial danger to Julius's physical or emotional well-being if he were placed in father's custody and there was no reasonable means to protect him short of removing him from father's custody.

*Denial of Reunification Services*

When the juvenile court removes a child from parental custody, it must provide services to the parent to reunify with the child unless it finds one of the exceptions listed in section 361.5, subdivision (b) applies.  (§ 361.5, subds. (a) & (b).)  The juvenile court denied father reunification services under section 361.5, subdivision (b)(6), which applies when the child has been adjudicated a dependent pursuant to any subdivision of section 300 as a result of the infliction of severe physical harm to the child or a half sibling of the child by a parent and the court finds it would not benefit the child to pursue reunification services with the offending parent.  Severe physical harm may be based on, but is not limited to, deliberate and serious injury inflicted on a child's body or the body of a sibling or half sibling of the child by an act or omission of the parent.  (§ 361.5, subd. (6)(A) & (C).)

In determining whether reunification services would benefit the child under section 361.5, subdivision (b)(6), the juvenile court must consider any relevant information, including the specific act or omission comprising the severe physical harm, the circumstances under which the abuse or harm was inflicted, the severity of the emotional trauma suffered by the child or the child's half sibling, any history of abuse of other children by the offending parent, the likelihood the child may be safely returned to the care of the offending parent within 12 months with no continuing supervision and whether or not the child desires to be reunified with the offending parent.  (§ 361.5, subd. (i).)

20

Here, the juvenile court concluded that father severely physically abused Dylan and that providing him reunification services would not benefit Julius.  Father's prolonged and severe physical assault on Dylan and previous incidents of abusing Dylan and Chloe amply support the court's finding.

For this court to overturn the juvenile court's denial of services order, father would have to show that substantial evidence does not support application of section 361.5, subdivision (b)(6) as he bears the burden on appeal.  Father has failed to carry his burden.  Consequently, we must deny his writ petition.

## DISPOSITION

The petition for extraordinary writ is denied.  The order staying the section 366.26 hearing is lifted.  This opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).